IN THE

# SUPREME COURT

OF THE

# STATE OF NEW YORK.

| 54    9|
|139a 415|

### J. BEEKMAN FINLAY *vs.* THEODORE COOK.

The premises intended to be conveyed by deeds were described as being 200 acres, more or less, in the right of W., K. & C., in lot No. 1, in the 24th allotment of the patent of K. *Held* that as this description contained several particulars, no lands could pass by the deeds, except such as corresponded with all the particulars.

That it was necessary that those claiming under such deeds should show that the lands claimed were in lot 1, and in that part of the lot to which the right of W., K. & C. extended; and if such right included more than 200 acres, the grantees would have been authorized to elect which 200 acres in the tract they would take, and such election would have made the grant operative, although the description was so uncertain that, of itself, it would convey nothing.

And no evidence being given, as to what part of lot 1 was covered by the right of W., K. & C., it appearing that K. alone claimed lot C in lot 1, but the lands conveyed were not a part of those claimed by K. alone; it was *held* that the deeds were ineffectual to establish the plaintiff's title to a particular portion of lot C in lot 1.

Possession by a tenant, of a portion of a lot of land, under a lease, and the clearing up and cultivating a part thereof, such possession being under a claim

of title by the lessor, which is evidenced by his executing the lease and demanding and receiving rent, is a good  dverse possession, at least to the extent of the land cleared and cultivated.

A comptroller's deed, given upon a sale of land for taxes, with actual possession of a part of the lot embraced in it, and claim of title to the whole, is a sufficient foundation for an adverse possession, even though the comptroller had not authority to sell.

If such deed be fair upon its face, and contains no evidence of want of authority by the comptroller to execute it, inasmuch as it purports to be executed under an authority, it gives color of title to the grantee, although the pretended authority recited upon its face does not in fact exist.

The possession and claim of title of the grantee in such a deed, and of those claiming under him, will be presumed to have been in accordance with the title apparently derived from the comptroller's deed; and as that deed did not show that it was illegal or void, the possession and claim under it will be presumed to have been in good faith, and therefore adverse to the title of the former owner, and if continued for the period of twenty years, will ripen into a perfect title.

Actual possession of a part of lot of land, with claim of title to the whole, the entry and claim being under a written instrument, is sufficient to constitute an adverse holding of the whole lot.

Persons in possession of land, under the title of another, are estopped to deny his title, or to set up an outstanding title in themselves or any other person.

Where a valid constructive possession of an entire lot is acquired by entry under claim of title founded upon a written instrument, and the actual occupation of a part, it cannot be defeated by a subsequent entry on the same lot by another, who makes an improvement on a part and obtains title to the whole lot.

The effect of such subsequent entry would be to give the person so entering a possession of the part actually occupied and improved, but no further. A constructive possession of the unimproved part of the lot would remain in him who made the first entry under claim and color of title and improved in part.

Section 55 of the act of the legislature of 1855, (*Laws of* 1855, *p.* 799,) made comptrollers' deeds for lands sold for taxes, *executed after the passage of that act,* presumptive evidence that the sale and all proceedings prior thereto, from and including the assessment of the land, and all notices required by law to be given previous to the expiration of the two years allowed to redeem, were regular. This section was amended in 1860, (*Laws of* 1860, *ch.* 209,) by adding thereto as follows: "But where the person or persons claiming title under such conveyance, or the grantees or assignees of such persons, shall be in possession of the land described therein, either by himself or themselves, or his or their grantees, assignees, agents, tenants or servants, then such conveyances shall be presumptive evidence of the facts above stated, *whatever may be the date of such conveyance.*" This amended section

Finlay *v.* Cook.

should be construed as including not only the case of an actual possession of the whole lot covered by the deed, but the constructive possession of the whole, when there is actual possession of a part of the land covered by the deed, with claim of title to the whole.

Giving the section that construction, the title of a party claiming under a comptroller's deed is perfect, without proof of any other fact than that he was in possession of a part of a lot under the deed, claiming title to the whole.

APPEAL from a judgment entered upon the report of a referee. The action was originally commenced before a justice of the peace, for trespass upon lot C, in lot 1 of great lot 1 in the 24th allotment of the Kayaderosseras patent. Title being pleaded, by the defendant, the present action was commenced in this court. The complaint was for entering upon the premises above mentioned, and cutting and carrying away timber and wood, and hay and other crops growing on said lot. The defendant, by his answer, denied that he had entered upon, or cut any wood, timber or trees upon, or had carried away any timber, trees, grass or any thing else, from the north part of lot C, in lot No. 1, in great lot No. 1 of the 24th allotment of the patent of Kayaderosseras, described in the complaint; such north part being about forty acres, late in the use and occupation of Warren Harvey. For a second defense, the defendant averred that at the time when, &c., the south part of the said lot, except about forty acres at the north end of the same, were the close, soil and freehold of John W. Bates, and that by the license and authority of the said John W. Bates the defendant did enter upon said south part of the said lot, as he lawfully might, and did then and there the acts complained of in said complaint.

The action was referred to a referee, who found the following facts :

The 24th allotment of the patent of Kayaderosseras was divided into thirteen great lots, numbered from one to thirteen, inclusive. Lot No. 1 was subdivided into three long parallel lots, by lines running nearly north and

south, and numbered 1, 2 and 3. Lot No. 1 of this sub-
division was again divided, by transverse lines, into three
lots, A, B and C. Lot C is the northernmost lot; it is
about two and a half miles in length from north to south,
and contains about 348 acres. On the 29th of March,
1792, the executors of John Kirby, deceased, under a
power contained in his last will and testament, conveyed
by deed to Dirck Lefferts of the city of New York, "lot
C, in lot No. 1 in the subdivision of lot No. 1 of the
24th allotment of the Kayaderosseras patent" The lot
was unoccupied and in a state of nature, being covered
with standing timber. In 1799 Dirck Lefferts died in the
city of New York, leaving a will, which in the same year
was admitted to probate, before the surrogate of the
county of New York. The testator, by this will, directed
his executors to sell, with the consent of John K. Beek-
man first obtained, all his lands not specifically disposed
of by his will. John K. Beekman, John Oothout and
Thomas Storm were constituted his executors. Neither
lot C, above mentioned, nor any part thereof, was speci-
fically disposed of. On the 2d day of May, 1803, the said
executors conveyed by deed, to Phillip Ten Eyck, several
lots of land in the Kayaderosseras patent, describing them,
and amongst them is "two hundred acres, more or less,
in the right of Walton, Kirby and Clopper, in lot No. 1 in
the twenty-fourth allotment." On the 3d day of May, 1803,
Phillip Ten Eyck conveyed the same lots of land, by the
same description, to John K. Beekman. On the 11th of
November, 1819, Mr. Beekman, by an instrument in writing
under seal, executed by and between himself and Elizabeth
Turk, leased to her for her life "all that certain lot No. 2 of
the smaller lots in lot No. 1 of the subdivision of lot No. 1
of the twenty-fourth general allotment of the patent of
Kayaderosseras, containing one hundred acres of land, and
is situate in the town of Corinth, in the county of Saratoga."
The first actual occupation of any part of lot C was by

Finlay *v.* Cook.

Mrs. Turk, soon after the execution of this lease. Under it she cleared up and cultivated eight or ten acres adjoining the west line of lot C, and near the middle of said west line. The northern limit of this clearing nearly coincides with the line between the said towns. 122 acres of lot C, taken from the north end, lies in Day, and the residue of the lot (226 acres) lies in Corinth. Subsequently Mrs. Turk occupied and cultivated a few acres on the north end of lot C, in the vicinity of the framed house afterwards erected by Effner & Rockwell. She afterwards abandoned it, and it was occupied for a time by Daniel Austin. He abandoned it, and it remained uninclosed and unoccupied until Mrs. Turk's death. She occupied, or did not abandon, the occupation of the eight or ten acres covered by her lease, during her life. She died about the year 1851. On the 1st day of March, 1834, the comptroller of the state of New York made and executed to Mr. Beekman a deed of three hundred and forty-eight (348) acres, of which 226 acres is in the south part of subdivision " C," and bounded on the north by the town line, east by lot 2, and on the south and west by lot line; also 122 acres, bounded north by Sibley, south by town line, and on the east and west by lot lines, " in subdivision ' C,' of lot No. 1 of great lot No 1 of the XXIVth allotment of the patent of Kayaderosseras." The said deed contained the recitals then usually inserted in such deeds; to the effect that default had been made in the payment of taxes assessed on said lands, in pursuance of chapter thirteen of the first part of the Revised Statutes, entitled " Of the assessment and collection of taxes," which taxes, with the interest and charges thereon, had remained unpaid in the comptroller's office for two years from the 1st of May following the year in which they were assessed; then stating the sale of the lands in question by the comptroller, at public auction, in May, 1830, and that they had not been redeemed within the two

years prescribed by law for the redemption thereof; that the said John K. Beekman had become entitled by purchase and transfer from the original purchaser at said sale, to said lands, and then conveying the said lands in fee to the said John K. Beekman.

John K. Beekman died in the city of New York, in 1842, leaving a will, which in the same year was admitted to probate before the surrogate of the county of New York. By this will, after disposing of some pieces of land other than. the premises in question, he devised all the residue of his real estate as follows: one-half thereof to Aletta Beekman, one-fourth thereof to Sarah James, and one-fourth thereof to Anne Finlay, if living at his decease, but if not living, then to her children in equal portions. The plaintiff is one of the children of Anne Finlay. She died August 5, 1842. Previous to 1852 her children and the other devisees above named conveyed to the plaintiff all their interest in said lot C.

In 1847 the plaintiff contracted with Effner & Rockwell for the sale of the lot to them at $2 per acre. They entered under the contract, paid $100 towards the purchase money, cut down and removed timber, and erected the framed house where Squire Houghton now lives. They put Isaac Mickles in the house to board the men who were lumbering on the lot, and they afterwards, upon his removal, put Samuel Effner in for the same purpose; and he continued to board them until he left the house, as hereinafter stated. Effner & Rockwell continued this occupation until the entry of Andrew Bingham, hereinafter mentioned.

In 1708, Anne, the sovereign of Great Britain, by letters patent, under the great seal of the Province of New York, granted to Adrian Hooglandt and Jovis Hooglandt and eleven others the patent of Kayaderosseras. Jovis Hooglandt died without lineal heirs. Belitia Hooglandt was one of the three daughters of Adrian Hooglandt, and

was married to James Renaudet. James Renaudet and Belitia his wife left six children, one of whom was Mary, who married Peter Chevalier. Another was Ann, who married Townsend White. Another died without issue. Peter Chevalier and his said wife Mary had issue—Isabella, who married George Turner. They had issue—Mary Sophia R. Turner. Her mother and all her ancestors, back to Adrian Hooglandt, are dead. Ann White had four children, among whom was Isabella, wife of William Edgar. Their son, Herman Le Roy Edgar, on the 27th day of November, 1843, conveyed by deed, to the said Mary Sophia R. Turner, all his interest in the Kayaderosseras patent. On the 31st day of January, 1848, and whilst Effner & Rockwell were in the occupation of the said lot as aforesaid, the said Mary Sophia R. Turner conveyed lot C, by deed, to Andrew Bingham. After the said conveyance, and in 1848, Bingham entered upon lot C under the aforesaid deed, and commenced cutting down trees and peeling bark. In March, 1849, Aletta Beekman and others brought an action of trespass in this court, against Bingham, for the said entry, &c., and on the trial the plaintiffs were nonsuited, upon the ground that the comptroller's deed above referred to was defective. After this trial Effner & Rockwell abandoned the lot, and Bingham continued cutting down and removing timber. He cleared up thirty or forty acres south of and adjacent to the framed house. In 1849 he hired Samuel Effner, who occupied the framed house, to remove from it, and erected a log house fifty or sixty rods southeasterly therefrom, and on lot C, which was used in connection with his lumbering operations on the lot. Bingham cut the hemlock timber over nearly the whole lot, and, (with the exception of Mrs. Turk, who used the land cleared up by her until her death, in 1851,) was the sole occupant, by himself and those occupying under him, until 1856. One Burrows moved into the framed house after Samuel Effner left,

and occupied it under Bingham, and worked at lumbering on the lot for Bingham. Bingham continued lumbering on the lot, and cultivating some of the cleared land, until December 5, 1851, when he conveyed the lot by deed to John W. Bates, who succeeded to Bingham's occupation. In the spring of 1852 Bates leased the whole lot to the defendant, including the two houses, and the defendant soon afterwards let the whole lot to Silas N. Holden, to cultivate it on shares. He lived in the framed house and his mother in the log house, both occupying under Bates' title. In August, 1856, while this occupation continued, the plaintiff and Silas N. Holden entered into an agreement in writing, under seal, whereby the plaintiff leased to him a certain lot of land in the town of Day, known as sub-lot 1 of great lot 1 of the 24th allotment of said patent, containing 348 acres, more or less, and known as lot C, for five years from the 1st day of April previous, at an annual rent of $25. Holden remained in the framed house and his mother in the log house, until about March, 1860. During this time Holden cultivated the cleared land on the north end of lot C and in the vicinity of the house in which he lived. On the 18th of January, 1860, the plaintiff and Warren Harvey entered into an agreement in writing, under seal, whereby the plaintiff leased to Harvey, for one year from that time, all that certain lot in Day, known as sub-lot 1 of great lot 1 of the 24th allotment of said patent, containing about 348 acres, at a rent of $20. Holden moved out in March following, and Harvey moved in and occupied the framed house, and cultivated the same land which Holden had cultivated, until the expiration of his lease, and remained under Squire Houghton until the spring of 1862. After Holden's mother quit the log house it was occupied, and has ever since continued to be occupied, together with an acre or two of cleared land surrounding it, by persons holding under Bates' title. This small piece of cleared

Finlay *v.* Cook.

land has always been occupied by the occupant of the log house. On the 18th of March, 1861, the plaintiff and Squire Houghton entered into an agreement under seal, whereby the plaintiff leased to Houghton, for one year, all that certain lot of land in Day, known as sub-lot 1 in great lot 1 of the 24th allotment of said patent, containing about 348 acres. Houghton moved in, in the place of Harvey, in March, 1862. In all these leases the lot is described as belonging to the plaintiff. Some time in the winter of 1862, and before Harvey removed, the defendant, by the authority and license of said Bates, cut down and carried away from the lot six standing trees, of the value in the aggregate of $2. The place where these trees were cut down was in Day, in the uncleared portion of lot C, on the northernmost 100 acres of lot C, and not upon the thirty or forty acres referred to in the defendant's answer. It was near the line fence between this lot and the defendant's lot, which adjoins it on the east, and southeastwardly from the framed house, and northeastwardly from the log house, and a few rods from the border of the woods adjacent to the cleared land occupied by Harvey, and in the woods, but nearer to the log house than to the framed house. The defendant cut down the trees for the purpose of having the title to the lot tested.

About the year 1837 Bosworth Martin, the agent of John K. Beekman for his lands in the 24th allotment, went upon the uncleared portion of lot C, and discovered some men abiding in a shanty and manufacturing staves from an ash tree which they had felled on the lot. They desisted, and settled with Mr. Beekman for the damages.

The referee's conclusion of law from the foregoing facts was, that the plaintiff was not entitled to recover of the defendant for the injury stated in the complaint; and he ordered the complaint to be dismissed, with costs. From the judgment entered upon this report, the plaintiff appealed.

Finlay *v.* Cook.

*Lewis Varney*, for the appellant. I. The facts found by the referee show conclusively that the plaintiff succeeded to all the title and possession of John K. Beekman, whose occupancy, by his tenant Mrs. Turk, was continued from November 11, 1819, until her decease in the autumn of 1851.

II. Computing only from the date of Mrs. Turks' lease, without reference to any prior occupation, or allusion to Bosworth Martin's agency and its protective results, the twenty years that tolled all right of entry against Mr. Beekman, and perfected his absolute title, expired on the 11th day of November, 1839; and her occupation continued in all 32 years, down to 1851. During this time Mrs. Turk occupied and cultivated a few acres on the north end of the lot, in the vicinity of the framed house. (2 *R. S.* 294. *Code of Procedure*, 83.)

III. And that, too, without regard to any deeds; one of which, dated the 29th of March, 1792, conveyed Kirby's estate to Lefferts, whose title from devise (deed to Ten Eyck, dated the 3d of May, 1803) vested in Mr. Beekman. The last mentioned is enough. Our purpose is only to show, under the statute, a constructive possession of the whole lot, whereof, by Mrs, Turk's occupancy and otherwise, Mr. Beekman and his successors had a *pedis possessio*. (*Palmer* v. *Aldridge*, 16 *Barb.* 131. *Smith* v. *Lorillard*, 10 *John.* 337. *Jackson* v. *Harder*, 4 *id.* 202.)

IV. The Finlay possession, being a continuation of Mr. Beekman's, was confirmed by the contract of sale to Effner & Rockwell, who thereby became *quasi* tenants to the plaintiff; under whom Effner & Rockwell went into actual possession, paid $100, and in 1847 lumbered there extensively, erected a frame house where Squire Houghton now lives, and built a log barn; his brother, Samuel Effner, occupying them as Mickles' successor, and as the hired man and tenant of Effner & Rockwell; who, and every person succeeding to his possession, (whether by purchase,

collusion or attornment,) is estopped from gainsaying the plaintiff's title, under which, and by virtue of the contract made in 1847, Effner & Rockwell acquired actual possession of lot C. In 1849 Bingham bought out Samuel Effner, and he then gave up possession to Bingham. The phraseology in the report is nothing more nor less than a selling out to Bingham by Effner & Rockwell's tenant. Silas Holden's alleged attornment to the plaintiff, in hostility to Bingham and Cook, applies only to the *cleared land,* as he was to work the land on shares; as to which Harvey is (if at all) estopped. But the possession of both enured to the benefit of the plaintiff, at his option. He had a right to retake actual possession by adopting Holden as tenant, thereby creating the relation of landlord and tenant. The above remarks as to incapability of attornment apply to Bingham, to Cook, to Silas Holden, and to his predecessor Nims. (3 *R. S.* 5th ed. 35, § 3. *Jackson* v. *Harder,* 4 *John.* 202. *Cook* v. *Travis,* 23 *Barb.* 338. *Spencer* v. *Tobey, Id.* 260.)

V. The plaintiff's possession was never abandoned by him; and the Effner & Rockwell contract could not abandon it, or attorn. That possession therefore—never relinquished—is sufficient to maintain this action for an injury to the reversion or inheritance. (3 *R. S.* 5th ed. 39, § 8.)

VI. Independent of other title and possession, Beekman obtained a perfect title by virtue of the comptroller's deed, dated March 1, 1834.

VII. The plaintiff can maintain trespass for an injury to the reversion or inheritance, notwithstanding Squire Houghton's subsisting lease for a short term. (3 *R. S.* 5th ed. 39, § 8, *cited above.*)

VIII. Houghton is an original tenant of the plaintiff, who had a right to treat Silas Holden and Harvey as his, the plaintiff's, tenants, and even to take attornments from them respectively, for the reason above stated, that they came in directly or indirectly under Bingham, and are

therefore, like Bates and Cook, estopped from denying the Finlay title. Nor can either of them, any more than Silas Holden, or his mother, or other sub-tenant, attorn to any person, especially to Bates or Cook. For the effect of this point and statement, it must not be forgotten that Bingham bought out Samuel Effner, the tenant of Effner & Rockwell. Independent of this, Holden moved off from the lot in March, 1860, and quitted the premises, and immediately after Harvey moved into the framed house, under and by virtue of a lease from the plaintiff, dated the 18th of January, 1860. Hence the plaintiff took actual possession of the lot after Holden (the pretended tenant of Bates) had left. (See Point III.)

IX. That adverse possession of the plaintiff, through the medium of Effner & Rockwell, rendered the Turner deed (dated January 31, 1848) to Bingham absolutely void, even if Miss Turner had a perfect title, which is not shown. The same remark applies to all the Turner deeds. (3 *R. S. 5th ed.* 30, § 167.) 1 *John. Cas.* 33, and 2 *Caines' Cas.* 314, show that a void deed cannot be valid for any purpose; especially the reason or design for which it is declared void *by statute*—void *in toto*.

X. Even if a perfect title in Miss Turner could have been shown, it can be available to her only in ejectment by her, or at least in her name, under the amended Code. Such title in her is of no benefit as a defense for Cook, in the pretended right of Bates, who cannot claim through a void deed to Bingham, the deed to Bates himself being in the same condition. (*Hay* v. *Cumberland*, 25 *Barb.* 594.)

XI. The *locus in quo* was actually in the border of the woods, and not upon the acre or two of land occupied by the pretended tenants (if any) in the log house, under Bates' title. The plaintiff was then in possession of all the lot, except (perhaps) as above stated.

XII. A disclaimer, or conveying by lessee in fee, may be, by the lessor, treated as a forfeiture, or held for naught,

Finlay *v.* Cook.

as in case of an attornment. The lessee is, in ejectment, estopped to show title out of the vendor. (*Jackson* v. *Davis*, 5 *Cowen*, 123. *Jackson* v. *Smith*, 7 *id.* 717. *Jackson* v. *Hotchkiss*, 6 *id.* 401. *Jackson* v. *Harper*, 5 *Wend.* 246. *Lawrence* v. *Brown*, 1 *Seld.* 394. *Jackson* v. *Stiles*, 1 *Cowen*, 575. 3 *Wend.* 339. 5 *Seld.* 45.)

XIII. The occupation of Mrs. Turk under a life lease from Mr. Beekman, and her cultivating a few acres during some portion of that time, where the framed house now stands, (in addition to her possession on the south end,) shows that her possession extended over the whole lot. The Harvey and Houghton lease, the Effner & Rockwell contract, and their entry upon the lot as original tenants of the plaintiff, under a color of title, extended in fact over the 348 acres. An actual possession of part, under claim of title to the whole of a lot, is adverse as to the whole. (*Jackson* v. *Bowen*, 1 *Cai.* 358. *Jackson* v. *Elston*, 12 *John.* 452. *Jackson* v. *Vermilyea*, 6 *Cowen*, 677. *Code of Procedure*, § 83.)

XIV. The defendant seeks to found his title upon letters patent granted in 1708, by Anne, sovereign of Great Britain, to Adrian Hooglandt and Jovis Hooglandt. The objection was taken upon the trial to this, that it was incumbent upon the defendant to prove the regular appointment of the three commissioners, in pursuance of the colonial act passed January the 8th, 1762, which was not done. The recital in a book containing a record of the proceedings of the commissioners, in making partition, is not legal proof. No fact having been found as to the appointment of the commissioners, of course this pretended title avails nothing as a defense to this action. (*Munro* v. *Merchant*, 26 *Barb.* 383. *Jackson* v. *Witter*, 2 *John.* 180.)

*Judiah Ellsworth*, for the respondent.

*By the Court,* ROSEKRANS, J.   The referee states the description of the premises intended to be conveyed by the deed from the executors of Lefferts to Ten Eyck and by Ten Eyck to Beekman, to have been two hundred acres, more or less, in the right of Walton, Kirby and Clopper, in lot No. 1 in the 24th allotment of the patent of Kayaderosseras.   This description contains several particulars, and no lands could pass by the deed except such as corresponded with all the particulars.   It was necessary that those claiming under these deeds should show that the lands claimed were in lot one, and in that part of the lot to which the right of Walton, Kirby and Clopper extended.   If such right included more than two hundred acres, the grantees would have been authorized to have elected which two hundred acres in the tract they would take, and such election would have made the grants operative, although the description is so uncertain that, of itself, it would convey nothing. (*See opinion of Beardsley, J., in Hathaway* v. *Power,* 6 *Hill,* 459.)   No evidence was given in the case as to what part of lot one was covered by the right of Walton, Kirby and Clopper.   It appeared that Kirby alone claimed lot C in lot one, but the lands conveyed were not a part of those claimed by Kirby alone.   These deeds were therefore wholly ineffectual to establish the plaintiff's title to the portion of lot C in lot one, upon which the trespasses complained of were committed.   It was, however, unnecessary for the plaintiff to resort to the deed smentioned, for the purpose of sustaining his action.

It appeared that as early as 1819 John K. Beekman, under whom the plaintiff claims title, was in possession, by his tenant, Mrs. Turk, of a portion of lot C, to whom in that year he leased one hundred acres, and that Mrs. Turk cleared up and cultivated under this lease eighteen acres near the middle of lot C and adjoining its west line, and that such possession continued until her death, in 1851.   This possession being under a claim of title by Beekman, which

Finlay *v.* Cook.

was evidenced by his executing the lease and demanding and receiving rent, was a good adverse possession, at least to the extent of the land cleared and cultivated by his tenant. In 1834 Beekman obtained the comptroller's deed for the whole of lot C, upon the sale of the lot for taxes, and the evidence shows that after that time he claimed to own not only the part cleared and cultivated by his tenant, Mrs. Turk, but also the residue of the lot which was uncleared. The comptroller's deed, with actual possession of a part of the lot and claim of title to the whole, was a sufficient foundation for an adverse possession even though the comptroller had not authority to sell. (*Blackwell on Tax Titles*, 663 *to* 670.) This deed was fair upon its face. It contained no evidence of want of authority by the comptroller to execute it. As it purported to be executed under an authority, it gave color of title to the grantee, although the pretended authority recited upon its face did not in fact exist. The possession and claim of title of Beekman, and of those claiming under him, is presumed to have been in accordance with the title apparently derived from the comptroller's deed; and as that deed did not show that it was illegal or void, the possession and claim under it are presumed to have been in good faith, and therefore adverse to the title of the former owner, and if continued for the period of twenty years, ripened into a perfect title. The question then arises whether the findings of the referee show that possession and claim of title by Beekman, and those claiming under him by virtue of the comptroller's deed, was continued for the period of twenty years prior to the committing the trespasses complained of. I think this fact is clearly deducible from the referee's findings. Actual possession of a part of the lot with claim of title to the whole, the entry and claim being under a written instrument, is sufficient to constitute an adverse holding of the whole lot. Mrs. Turk's occupation of that part of lot C, which she cleared, is found to have

continued from 1834 to 1857. In 1847 the plaintiff, who had taken a conveyance of the lot from the devisees of Beekman, contracted to sell the whole lot to Effner & Rockwell, and they entered under the contract and cut down and removed timber from the lot and erected a framed house upon it, and put Samuel Effner into possession of the house for the purpose of boarding their hands. In 1848, while Effner & Rockwell were thus in possession under the contract with the plaintiff, one Bingham took a deed of the lot from Mary S. R. Turner, a remote heir of one of the thirteen original patentees of the Kayaderosseras patent. From the evidence and findings of the referee her share was 1-195th of the lot. In 1843 Mrs. Turner took a deed from another remote heir of one of the patentees, apparently having an equal interest with her, of all his interest in the patent, and the deed from Mrs. Turner to Bingham purported to convey the entire lot. In 1849 Aletta Beekman and others, devisees of John K. Beekman, commenced an action against Bingham for cutting timber upon the lot, and upon the trial of the action the plaintiffs were *nonsuited,* on the ground that no evidence was given to show the proceedings prior to the comptroller's deed authorizing a sale of the lot for taxes. The referee finds that after this trial Effner & Rockwell abandoned the lot. But he does not find that he restored to the plaintiff the possession of the framed house or the land on which it stood. On the contrary, it appears that their servant, or tenant, Samuel Effner, still continued in possession of that house, and that Bingham subsequently, in 1849, hired him to remove from the house, and that upon his removal Bingham entered and put one Burrows into possession of it as his tenant. In December, 1851, Bingham conveyed the whole lot to Bates, who succeeded Burrows in the occupation of the framed house, and in 1852 Bates leased the whole lot to the defendant, and the defendant leased the whole lot to Holden, who moved into

Finlay *v.* Cook.

the framed house, and in 1856, while Holden was in possession of that house, *the plaintiff* leased the whole lot to Holden for five years. Holden remained in possession of the framed house until the spring of 1860. In January, 1860, the plaintiff leased the whole lot to Harvey for one year, and in March, 1860, Holden moved out of the framed house and Harvey moved into and occupied it during the continuance of his lease. In the spring of 1862, while Harvey was in possession of the framed house, the defendant, by the authority of Bates, cut down and carried away from the uninclosed part of the lot six standing trees, for which act this action is brought.

Now it is apparent, from these facts, that Beekman and those claiming under him have been in the actual possession of lot C, claiming title to the whole lot under the comptroller's deed, and so constructively in possession of the whole lot from the date of that deed down to the time of the committing of the trespass complained of in 1862, a period of 28 years. Until 1851 they were in actual possession of the land cleared by Mrs. Turk, by her as their tenant. The possession of Effner & Rockwell, under their contract of purchase, was the possession of Beekman and his devisees. They were quasi tenants of the plaintiff. The possession of the framed house by Samuel Effner, the servant or tenant of Effner & Rockwell, was the possession of the plaintiff, and when Bingham, in 1849, hired Samuel Effner to leave the house, and entered himself and put Burrows in as his tenant, Bingham and Burrows' possession of that house was that of the plaintiff, and Bates and Holden and the defendant, all of whom claimed under Bingham, stood in precisely the same relation to the plaintiff, as to the framed house. They were all in possession under the plaintiff's title, and were estopped to deny his title or to set up an outstanding title in themselves or any other person. The learned referee concedes that Samuel Effner was in possession of the framed house as

servant or tenant of Effner & Rockwell, but he states that he does not perceive how that fact, and the circumstance of Bingham's hiring him to leave the house, and Bingham's entry into the possession upon Effner's quitting the house, constituted Bingham a tenant of the plaintiff, or an occupant under him. This was the radical error of the referee.

The case is analogous to that of *Jackson ex dem. Livingston* v. *Walker,* (7 *Cowen,* 637.) There the lessee of the plaintiff had contracted to sell the premises in question to one Storm, and Storm had entered under the contract. Storm had removed from this state and resided in Ohio, having left his wife and family in possession of the premises. One Garnsey, who claimed title to the premises, hired Storm's wife to quit the premises, and paid three dollars to one Covill, who came into possession of part of the premises under Mrs. Storm, for a surrender of his part. Garnsey entered into possession upon Mrs. Storm's and Covill's leaving, and put the defendant in possession. It was held in that case that Storm could not set up title against his vendor, under whom he entered, and that a claim of title which could not be set up by a person while in possession, cannot be set up by another person who comes into possession under him. And in reference to the manner in which Garnsey acquired the possession, and the effect of it, Woodworth, J., delivering the opinion of the court, speaks thus: " Here Garnsey purchased the possession of Mrs. Storm. If paying her for that possession, inducing her to quit, and then entering himself, is not an entry under the person who contracted with Livingston, or those representing the purchaser from Livingston, I am at a loss to determine what constitutes an entry under another." And again: " If Garnsey did not come in under Storm, or those who represented him, I ask how did he obtain possession? The premises were not vacant. The entry was not by force. The lot was

Finlay *v.* Cook.

in the actual occupation of Storm's family. Did they abandon without a compensation, or concert with Garnsey? The contrary appears. He held out inducements which were successful. The actual possession was worth contending for, in a case where the title was involved in difficulty. But if the title was perfect, much was gained by immediate possession. That was the object sought after, paid for and obtained. After it was obtained, to say nothing was acquired under Storm is to my mind an absurdity. *The plaintiff was entitled to the benefit of Storm's possession thus acquired by the defendant.* It is alike the dictate of justice as of law that the defendant restore it before he can be permitted to show title in himself, or an outstanding title in another."

The remarks are peculiarly applicable to the possession by Bingham, and those claiming under him, of the house upon lot C, in this case. All the occupants, from Effner to Holden, derived their possession mediately or immediately from Beekman, and he and his successors were bound, in justice and in law, to restore their possession to the plaintiff, under whom they held, and who was in the possession of the framed house on the lot. Holden was bound to restore the possession of the framed house to the plaintiff. He was quasi tenant of the plaintiff, and could not set up title in another. It was therefore lawful for him to take, and for the plaintiff to give, a lease of the lot while he held possession under the lease from the defendant. Neither Bingham nor any other party claiming under him could set up title against the plaintiff, if they had any, and the case shows that none of them had the shadow of title. The deed to Bingham having been executed while the lot was held adversely by Effner & Rockwell under the plaintiff, the statute annulled that deed and struck it out of existence. The attornment of Holden, or his surrender of possession when he took a

lease of the lot from the plaintiff, was not to a stranger, but to the party under whom he held, and as to whom, until such possession was surrendered, neither Holden nor the defendant could set up title in another. They claimed, of necessity, a part of the lot at least, to wit, the framed house, under the plaintiff, and could claim under no other. A continued protestation that they did not claim under the plaintiff would have been of no force. Thus the plaintiff is shown to have been in the actual occupation of a part of the premises covered by the comptroller's deed, from 1834 down to the time of the committing of the trespasses complained of.

I am aware that it appears that Bingham erected a log house upon the lot, and claimed a portion of the land which was actually occupied by him and those claiming under him, the possession of which part of the lot was not acquired by the purchase from Samuel Effner. But the possession of these parts of the lot could not affect the plaintiff's constructive possession of the unoccupied parts of the lot. Where a valid constructive possession of an entire lot is acquired by entry under claim of title founded upon a written instrument, and the actual occupation of a part, it cannot be defeated by a subsequent entry on the same lot by another, who makes an improvement on a part and obtains title to the whole lot. The effect of such subsequent entry would be to give the person so entering a possession of the part actually occupied and improved, but no further. A constructive possession of the unimproved part of the lot would remain in him who made the first entry under claim and color of title, and improved in part. This was held in the case of *Jackson* v. *Vermilyea*, (6 *Cowen*, 677, 680.)

The place where the trespasses complained of in this case were committed was uninclosed and unimproved. No one had the actual possession of it. The plaintiff

alone had the constructive possession of it. It does not appear that Beekman, or any one claiming under him, ever renounced the claim of title to the whole lot after the comptroller's deed was executed.

I have thus far considered the case as though it was necessary that the comptroller's deed should have been accompanied by an adverse holding under it for twenty years, in order to entitle the plaintiff to recover, or that he should have proved the existence of the facts recited in it, giving authority to the comptroller to make the sale in case the grantee's possession was short of twenty years. This latter proof was necessary when the case of *Beekman* v. *Bigham* was decided, (1 *Seld.* 366.) The learned referee states, in his opinion, that the same objections to the title under the comptroller's deed still exist, and it is evident that he regards the preliminary proof as still necessary in order to give effect to such deed. In this he is mistaken. The act of 1850, (*page* 657, *chap.* 298, § 83,) referred to in the opinion of the court in *Beekman* v. *Finlay*, made the deed of the comptroller, of lands sold by him for taxes, thereafter executed, presumptive evidence that the sale and all proceedings prior thereto, from and including the assessment of the lands, and all notices required by law to be given previous to the expiration of the two years allowed to redeem, were regular. Chapter 183 of the laws of 1850 declared the same rule applicable to deeds of the comptroller executed before or after the passage of that act, except in case where the grantee, or those claiming under him, should refuse to release to the owner or occupant of the land upon being tendered the amount paid at tax sale, with interest at ten per cent, and the costs of suit to recover the lands. It is unnecessary to decide whether this last act was repealed by section 114 of the first act cited, as it was expressly repealed by section 92 of chapter 427 of the laws of 1855. (*Laws of*

1855, _p._ 799.) But section 65 of the act of 1855 made comptrollers' deeds for lands sold for taxes, executed _after the passage of that act,_ presumptive evidence that the sale and all proceedings prior thereto, from and including the assessment of the land, and all notices required by law to be given previous to the expiration of the two years allowed to redeem, were regular. This section was amended in 1860, (_Laws of_ 1860, _chap._ 209, _p._ 352,) by adding thereto, as follows : " But where the person or persons claiming title under such conveyance, or the grantees or assignees of such persons, shall be in possession of the land described therein, either by himself or themselves, or his or their grantees, assignees, agents, tenants or servants, then such conveyance shall be presumptive evidence of the facts above stated, _whatever may be the date of such conveyance._" This amended section, I think, should be construed as including not only the case of an actual possession of the whole lot covered by the deed, but the constructive possession of the whole, when there is actual possession of a part of the land covered by the deed, with claim of title to the whole. Giving the act this construction, it is clear that the title of the plaintiff was perfect under the comptroller's deed, without proof of any other fact than that he was in possession of a part of the lot C, under the deed claiming title to the whole. This proof he gave, as I have already shown, from the findings of the referee. The plaintiff thus showed title to the _locus in quo._ The alleged trespass was committed as far back as 1834. There being no evidence to affect the presumption mentioned in the statute, there was no adverse title. The assessors may not have known of any subdivision of lot C, and if so, their assessment was correct. (1 _R. S. 5th ed._ 910, § 11. _sub._ 2.) The statute declares the deed presumptive evidence of the regularity of the assessment.

The plaintiff should have had judgment in his favor, upon the facts found by the referee.

---

The judgment for the defendant should be reversed, and a new trial ordered, with costs to abide the event, and the reference discharged.

[CLINTON GENERAL TERM, July 11, 1865. *James, Boekes* and *Rosekrans,* Justices.]